# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2235

_____

| | | |
|---|---|---|
| Juquan Demetrius Muhammad, | * | |
| aka Willie Murry, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Ricky McCarrell, Sgt., Varner | * | |
| Super Max, ADC; James Murry, Lt., | * | |
| Varner Super Max, ADC; | * | |
| John Doe, Dr., Southwest Hospital; | * | |
| Jimmy Via, Captain, Varner Super | * | |
| Max, ADC; Ransom Evans, Lt., | * | |
| Varner Super Max, ADC (originally | * | |
| sued as Raven Evans); Joann | * | |
| Burnett, LPN, Varner Super Max, | * | |
| ADC (Originally sued as Pam Burnett), | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: June 9, 2008
Filed: August 7, 2008(Corrected: 8/08/2008)

_____

Before SMITH, BOWMAN, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

Juquan Demetrius Muhammad, an inmate at the Varner Supermax Unit ("Varner"), filed this 42 U.S.C. § 1983 action against Varner and several of its

officers, asserting a tort claim for battery and alleging that his Eighth Amendment rights were violated when officers used excessive force to extract him from his cell. The jury returned a defendants' verdict. Muhammad appeals, arguing that the district court[1] committed plain error (1) by not overturning the jury verdict in favor of the defendants with regard to his Eighth Amendment and battery claims, and (2) in allowing the defense to make certain statements during closing argument. We affirm.

## I. *Background*

On March 8, 2002, Muhammad was unruly and caused a disturbance in his cell block. Muhammad taunted an officer, Tina Buchannon, calling her names in an apparent attempt to get out of his cell. Officer Buchannon reported the incident to Sergeant Ricky McCarrell, the supervisor of Muhammad's cell block. Sergeant McCarrell, in turn, passed the report along to Lieutenant Ransom Evans, his superior officer.

Lieutenant Evans attempted to handcuff Muhammad before seeking to remove him from his cell, but Muhammad refused to cooperate. Muhammad stated his intent to continue causing a disturbance "all day." Lieutenant Evans warned Muhammad that the guards may use force should he fail to cooperate. Not heeding the warnings, Muhammad persisted in noncompliance. Concerned Muhammad had a weapon,[2] Lieutenant Evans testified at trial that he wanted to place Muhammad in handcuffs. Lieutenant Evans ordered Muhammad several more times to submit, to no avail, so he sprayed two bursts of pepper spray toward Muhammad's face. Lieutenant Evans

---

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

[2]A few weeks before this incident, Muhammad attacked another officer with a handmade weapon. Lieutenant Evans had to help subdue Muhammad in the earlier incident. Additionally, in the nine months prior to this incident, Muhammad had been found guilty of committing 16 major disciplinary violations.

alleged at trial that the spray had no discernible effect on Muhammad, so Evans left the cell block and returned with his superior, Captain Jimmy Via and others.

Because the officers knew that they would have to use force beyond pepper spray, one of the officers who came to the scene brought a video camera to document the incident. By this time, Muhammad had used his mattress to barricade his cell door. Because Muhammad continued to disobey orders, Lieutenant Evans dispensed a No. 15 OC Stinger grenade[3] into Muhammad's cell between the cell door and the mattress. Most of the gas from the grenade escaped the cell without affecting Muhammad.

After the Stinger grenade failed to achieve Muhammad's compliance, officers tried tear gas, but it also failed.[4] After the tear gas failed to subdue Muhammad, Captain Via warned Muhammad that the officers would use a barricade round if he did not submit to the restraints. When Muhammad continued to resist, the officers shot a 37MM Ferret OC powder round—a round that is designed to break through a barricade—at the cell wall, not at Muhammad. He still refused to comply. Then, officers dispensed a 28b Stinger 37MM 60 Cal. rubber-ball round into the cell—this attempt to subdue Muhammad also failed.

Officer James Murry shot another Ferret OC powder round into Muhammad's cell. This round went through the mattress and hit Muhammad in the groin area, finally subduing him. Murry testified that he was not aiming at Muhammad. When asked by Muhammad's counsel whether he told the warden that he planned to shoot the round through the mattress at Muhammad, Murry answered affirmatively. He

---

[3]The grenade is similar to a military style grenade, except it contains small rubber balls that are surrounded by oleoresin capiscum gas. The grenade usually inflicts only bruises and is used primarily for riot control.

[4]The tear gas is packed into a projectile and shot using a handgun-type weapon. On contact, the projectile explodes, allowing the gas to fill the air, causing skin irritation and breathing difficulties.

immediately clarified his answer to explain that he told the warden that he planned to shoot the round through the mattress.

According to Lieutenant Evans, initially, no weapon was found in Muhammad's cell; however, Muhammad later admitted that a weapon was in his pocket. Officers searched him and seized the weapon. Muhammad was found guilty of eight disciplinary violations for his actions during this incident.

The powder-round wound to Muhammad's leg required outpatient surgical treatment. After surgery, Muhammad was transported back to the Department of Corrections Infirmary.

Muhammad sued Varner and several of the officers at the facility—Sergeant McCarrell, Lieutenant Evans, Officer Murry, and Captain Via. Officer McCarrell was dismissed from the case, and the case proceeded to trial as to the remaining defendants.

During closing argument, the defense attorney stated the following:

> It sounds pretty silly for me to stand here after you've listened to two days full of testimony to say this case is really simple, it comes down to the point of all he had to do was follow a direct order. But in all honesty, that's all it comes down to. All Mr. Muhammad had to do was follow a direct order.

And later in his argument, defense counsel stated that "[Muhammad] made no effort to comply with any direct orders whatsoever and even at the end, didn't comply with the direct order because that is what he chose to do."

Ultimately, the jury returned a verdict for the defense. Muhammad appeals the jury's verdict.

## II. *Discussion*

On appeal, Muhammad challenges the verdict, arguing that (1) the evidence was insufficient to support a verdict for the defendants, and (2) the defense attorney's comments during closing arguments unfairly prejudiced the jury. Muhammad did not file any post-trial motions; therefore, we review his arguments for plain error. *United States v. Quintanilla*, 25 F.3d 694, 698 (8th Cir. 1994).

### A. *Sufficiency of the Evidence*

Muhammad argues that there was insufficient evidence to support the jury verdict and that the jury found for the defendants only because they disregarded the law. We disagree.

To prevail on his § 1983 action, Muhammad had to prove that officers used excessive force—i.e. force was used "maliciously and sadistically for the very purpose of causing harm." *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008). And under Arkansas law, "[b]attery is a wrongful or offensive physical contact with another through the intentional contact by the tortfeasor and without the consent of the victim, the unpermitted application of trauma by one person upon the body of another person." *Costner v. Adams*, 121 S.W.3d 164, 170 (Ark. App. 2003). The officers' use of force in extracting Muhammad from his cell was the underlying factual predicate for both claims, and in their defense, the officers asserted that force was only used to secure Muhammad's compliance with their reasonable commands and to restore order to the cell block.

Muhammad does not challenge the accuracy of the jury instructions; he merely contends that the only way for the jury to have found against him was for it to have disregarded the court's instructions. There is no evidence in the record of such misconduct, and unless given a reason for doubt, we must presume that the jury followed the instructions as given. *See City of Los Angeles v. Heller*, 475 U.S. 796, 798 (1986) (stating that "the theory under which jury instructions are given by trial

-5-

courts and reviewed on appeal is that juries act in accordance with the instructions given them . . ."); *see also Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S 474, 485 (1933) ("Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct").

Moreover, Muhammad's appeal is, in essence, an attack on the jury's credibility determinations. Muhammad asks us to make a factual inference contrary to the jury's findings regarding the officers' motives. Such an inference would contravene our standard of review, and we thus decline. *See Schooley v. Orkin Extermination, Co., Inc.*, 502 F.3d 759, 766 (8th Cir. 2007) (stating that in challenges to the sufficiency of the evidence, "we must view the evidence in the light most favorable to the verdict . . . "). We will not reverse the jury's verdict on these grounds. "It is well settled that a district court's assessment of a witness's credibility is a judgment call and 'virtually unassailable on appeal.'" *United States v. King*, 518 F.3d 571, 575 (8th Cir. 2008) (quoting *United States v. Marshall*, 411 F.3d 891, 895 (8th Cir. 2005)).

B. *Defense Attorney's Closing Argument*

Muhammad also argues that opposing counsel misstated the law during closing arguments and that the comments so severely damaged Muhammad's ability to receive a fair trial that it constituted plain error for the district court to have allowed the statements. Specifically, Muhammad contends that the attorney asserted that Muhammad had not proven an Eighth Amendment violation in this case because Muhammad's conduct essentially asked for excessive force. The appellees assert that defense counsel merely made the point that Muhammad's continued resistance caused the force escalation, not that Muhammad asked for excessive force.

We conclude that allowing the attorney's comments did not amount to plain error on the part of the district court. Even assuming counsel's comments were objectionable, Muhammad has not shown plain error. To secure a reversal under the

plain error standard, Muhammad must show that defense counsel's comments caused an error constituting a "manifest miscarriage of justice." *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc*., 320 F.3d 838, 840 (8th Cir. 2003). If the plaintiff's attorney is given an opportunity to rebut an erroneous argument, this may explain away any prejudicial effect. *See Rogers v. Rulo*, 712 F.2d 363, 367 n.3 (8th Cir. 1983) (recognizing that a lawyer's comments during closing argument may "explain[] away the alleged prejudicial effect" of the opposing parties' closing argument comments). Here, Muhammad's attorney had an opportunity to address the comments by the defense attorney and to explain that it is no defense to an Eighth Amendment claim that a defendant was acting unruly. Therefore, even if we agreed that the comments were improper, as characterized by Muhammad, there was no plain error here because Muhammad's attorney had an adequate opportunity to address the jury about any potential prejudicial effect.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____